## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BEVERLY STEWART,** both individually and as Special Administrator of the Estate of Susan Leslie Stuckey,<br><br>**Plaintiff,**<br><br>vs.<br><br>**CITY OF PRAIRIE VILLAGE, KANSAS**, et al.,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Case No. 12-cv-2185-JAR/DJW** |

### MEMORANDUM AND ORDER

In the aftermath of her daughter's tragic death, Plaintiff Beverly Stewart filed this lawsuit both individually and as Special Administrator of the Estate of Susan Leslie Stuckey against Defendants City of Prairie Village, Police Chief Wesley Jordan in his individual and official capacity, and against Officers Wes E. Lovett, Tim Schwartzkopf, Byron Roberson, Seth Meyer, John Olson, Dan Stewart, Benjamin Micheel, and Adam Taylor in their individual capacities. Plaintiff claims that Defendants violated Stuckey's right to be free from use of excessive force under the Fourth and Fourteenth Amendments and Stewart's right to familial association under the First and Fourteenth Amendments. The case is currently before the Court on Defendants' Motion to Dismiss (Doc. 3). In their motion, Defendants argue that Plaintiff has not alleged sufficient facts to show that any Defendant violated Stuckey's or Stewart's rights. And further, Defendants argue that Defendants sued in their individual capacity are immune from liability under the doctrine of qualified immunity. The motion is fully briefed, and the Court is prepared to rule. As explained more fully below, the Court grants the motion in part and denies the

motion in part.

## I. Legal Standard

To survive a motion to dismiss, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[1] "[T]he complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[2] The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[3] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4] Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[6] Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth,

---

[1]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[2]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in the original).

[3]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4]*Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5]*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6]*Id.*

or merely legal conclusions that are not entitled to an assumption of truth.[7]  Second, the court

must determine whether the factual allegations, when assumed true, "plausibly give rise to an

entitlement to relief."[8]  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."[9]

**II. Factual Allegations**

   The following facts are alleged in Plaintiff's Complaint and construed in the light most

favorable to Plaintiff.  Susan L. Stuckey suffered from mental health problems, including severe

depression and post-traumatic stress disorder, and she received Social Security disability.

During March 2010, Stuckey's behavior became more erratic, her mental state greatly

deteriorated, and her mental problems were quite obvious.  Stuckey made frequent calls to the

Prairie Village Police Department, and various members of the Prairie Village Police

Department and the Johnson County Mental Health Center conducted welfare checks on

Stuckey.  Also at this same time, Stuckey's landlord had begun eviction proceedings against her

because she refused to vacate the suite she had been temporarily occupying while her apartment

was being cleaned following an accidental cooking fire.  The Prairie Village Police Department

knew of Stuckey's increasing mental health problems and the eviction proceedings.

   On the morning of March 31, 2011, Stuckey was alone in her apartment in Prairie

Village, Kansas.  On that morning, Stuckey made several 911 calls to the Overland Park, Kansas,

---

[7]*Id.* at 679.

[8]*Id.*

[9]*Id.* at 678.

and Leawood, Kansas, Police Department, demanding that the police bring her cigarettes and stating that the police should be armed because she wanted the police to kill her, she would give them a reason to kill her, and she was going to commit "suicide by cop."  Police from the respective police departments conveyed the content of the calls to a Prairie Village, Kansas, police dispatcher, who sent officers to Stuckey's apartment.  Fifteen or more Prairie Village police officers went to Stuckey's apartment, and Captain Wes Lovett had tactical command of the scene.  When the officers arrived, Stuckey would not allow the officers to enter her apartment and would only communicate with them by yelling through the front door to her apartment.  Distraught and agitated, Stuckey barricaded her front door and repeatedly said that she would kill herself.

The police informed the Johnson County Mental Health Center that they planned to remove Stuckey from her apartment.  A staff member there offered to send a counselor to Stuckey's apartment, but an officer told the staff member that was not necessary.  The police then evacuated the apartment building, with the exception of one woman.  Fire department and emergency medical personnel were on the scene.

Defendant Lovett contacted Police Sergeant Byron Roberson and told him to mobilize the Prairie Village Critical Incident Response Team 1 ("CIRT 1").  Defendant Roberson acted as the team leader for CIRT 1.  Defendants Olson, Stewart, and Meyer were also members of CIRT 1.  Defendant Tim Schwartzkopf contacted Police Chief Wes Jordan and briefed him about the unfolding events.  Chief Jordan was concerned about the possibility of a fire and gave his approval to enter the apartment.

Defendant Lovett wanted to enter Stuckey's apartment before the CIRT arrived, but

Defendant Roberson knew Defendant Lovett had limited CIRT experience and told Lovett to wait to enter the apartment.  Defendant Roberson also contacted an officer on the scene and directed him to attempt to calm Lovett and make him slow down.  Defendant Roberson believed that if Stuckey wanted to harm herself or burn down the building she would have done it already.

Within ten minutes of the arrival of Defendant Roberson and CIRT 1, Defendant Lovett declared that negotiations with Stuckey had failed.  Defendant Lovett made this decision even though no officer trained in negotiations had spoken with Stuckey.  An officer trained in hostage negotiation was on the scene, but Defendant Lovett felt the officer was too busy controlling the scene to talk to Stuckey.

Stuckey told Defendant Taylor that she wanted to talk to her mother.  She gave Defendant Taylor her mother's name and telephone number.  Defendant Taylor passed the information on to another officer, but no one contacted Stuckey's mother, Stewart.  Had Stewart received a call from the police, she would have immediately gone to Stuckey's apartment to talk to her daughter.  Instead, Defendant Taylor told Stuckey that the police could not contact her mother.

Stuckey remained barricaded in her apartment.  Members of the CIRT surrounded Stuckey's building, and officers positioned snipers who could see into the apartment.  Team members were clothed in riot gear with protective helmets.  Defendant Roberson formulated an operation plan to enter the apartment and remove Stuckey.  The operation plan did not include any provision for use of methods—further negotiations, the use of chemical munitions, or the use of non-lethal weapons—other than to forcibly enter the apartment and remove Stuckey.  Defendant Lovett and Defendant Schwartzkopf approved the plan.  This plan went against

Prairie Village Police Department policy, which provides that negotiations should be the primary tactic in barricade situation.  Other approved options include the use of chemical munitions to influence the suspect to come out of his or her stronghold and tactical entry only when all other means of persuasion are exhausted or fail.  The officers knew that Stuckey was armed with a baseball bat and expected her to be waiting near the door when they entered.

Defendant Lovett ordered Defendant Taylor to inform Stuckey that she had two minutes to exit her apartment or the police would remove her.  After she failed to exit, Defendant Lovett ordered Defendant Roberson and his team to enter the apartment.  Defendants Roberson, Olson, Stewart, Meyer, Taylor and Micheel positioned themselves outside Stuckey's front door in the hallway.  Defendant Meyer breached the door using a battering ram and moved the door out of the way.  Defendants Roberson and Olson entered the foyer of the apartment and saw Stuckey swinging a baseball bat, which they took from her.  Defendant Roberson also took a broom handle from her.  Defendant Roberson fired his TASER twice at Stuckey and Defendant Taylor fired his TASER once, but the TASER darts do not appear to have hit Stuckey.

Plaintiff alleges that an audio recording from the scene indicates that Defendant Roberson told Stuckey, "don't pick up that knife."  Two seconds later, three shots were fired.  Defendant Roberson claims that Stuckey grabbed a knife and then threw it at him as he shot her; he states that the knife bounced off his body armor and fell to the floor.

All three shots hit Stuckey, including one shot in the back.   Stuckey died.  The shots indicated that Stuckey was not shot at close range, and the location of the shots and the blood spatter from the apartment suggest that Defendant Roberson shot Stuckey in the living room, not the foyer as he originally described.

6

After the shooting, the Officer Involved Shooting Investigation Team (OISIT) investigated, and Johnson County, Kansas, District Attorney Stephen Howe cleared Defendant Roberson of criminal wrongdoing, although the investigation did not address whether the Defendants made operational errors or were adequately trained and supervised.

## III. Discussion

Plaintiff alleges numerous claims against Defendants, all of which arise under 42 U.S.C. § 1983.  Under § 1983, a plaintiff must establish that (1) the defendant acted under the color of state law and (2) the actions deprived the plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States.[10]  Neither party disputes that Plaintiff has sufficiently alleged that Defendants acted under the color of state law.  The dispute is whether Plaintiff has alleged facts showing that Defendants deprived Plaintiff of rights, privileges, or immunities secured by the Constitution.

Defendants claim that Plaintiff has failed to allege facts showing that the municipality, Defendant Jordan, in his official capacity, and any Defendants sued in their individual capacity violated any constitutional rights.  Even if Plaintiff has met that burden, Defendants argue, the Defendants sued in their individual capacity are entitled to qualified immunity.

### A.      Excessive Use of Force:

Plaintiff's Counts I, II, III, and IV all rely on the same underlying constitutional violation, Defendant Roberson's alleged excessive use of force against Stuckey.  The court first evaluates this allegation in order to assess whether the counts may proceed.

---

[10]42 U.S.C. § 1983.

As a preliminary matter, this allegation is evaluated under the Fourth Amendment's reasonableness standard.  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."[11]  Although Plaintiff suggests that the Court may apply the Fourteenth Amendment to analyze some actions leading up to Stuckey's death, the Complaint only alleges that Defendant Roberson's use of deadly force was excessive; there is no allegation that the TASER use was excessive force.  Because Defendant Roberson's actions in shooting Stuckey were clearly a seizure,[12] only the Fourth Amendment analysis is applicable.  To the extent that Defendants' broader actions are relevant, they are relevant under the totality of the circumstances approach used by the Court in applying the Fourth Amendment's reasonableness standard.

Plaintiff alleges that Defendant Roberson used excessive force against Stuckey when he shot her three times, killing her.  To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a "seizure" occurred and that the seizure was "unreasonable."[13]  There is no argument here that Stuckey was not seized.

Under the Fourth Amendment reasonableness standard, an officer's use of deadly force is "justified under the Fourth Amendment if a reasonable officer in [the officer's] position would

---

[11]*Graham v. Connor*, 490 U.S. 386, 395 (1989).

[12]*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989) (holding that a seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied").

[13]*Id.* at 599.

have had probable cause to believe that there was a threat of serious physical harm to themselves or others."[14]  Courts determine whether the actions were objectively reasonable in light of the surrounding facts and circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the defendant actively resists arrest or attempts to evade arrest by flight.[15]  But in analyzing the surrounding facts and circumstances, courts must judge the officer' s actions from the perspective of a reasonable officer on the scene, who is often forced to make split-second judgments about the amount of force that is necessary under the particular circumstances.[16]

In this case, several of the facts alleged weigh for Defendants' argument that Defendant Roberson's use of force was reasonable.[17]  For example, Stuckey was actively resisting arrest and had declared her desire to commit suicide by cop, suggesting that she posed a threat to the safety of the officers or others.  But interpreting Plaintiff's factual allegations in the light most favorable to the Plaintiff, the allegations allow for a reasonable inference that Stuckey did not pick up a knife and threaten the officers with it before Defendant Roberson shot her.  Further, the fact that one of the three successively-fired bullets entered Stuckey's back allows for a

---

[14]*Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995) (citing *Graham*, 490 U.S. at 396).

[15]*Graham*, 490 U.S. at 397.

[16]*Id.* at 396–97.

[17]In ruling on this motion, the Court will not consider the video and audio recording submitted by Defendants.  "[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"  *Alvarado v. KOB–TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).  Although the recording is referred to in the Complaint, and although it addresses an issue central to Plaintiff's claim, Plaintiff argues that she cannot know if the tape is a true and accurate record of the event without discovery.  Because the parties dispute the recording's authenticity, the Court will not consider it.

reasonable inference that Stuckey was not even facing the officers when Defendant Roberson shot and killed her.  And evidence that the gun was fired at a distance from Stuckey also minimizes the reasonableness of the use of deadly force.  If Stuckey was not threatening the officers with the knife and was instead facing away from or running from the officers, a reasonable officer in Defendant Roberson's position would not have probable cause to believe at the time of the shooting that there was a threat of serious physical harm to himself or others that would justify his use of deadly force.  The factual allegations state a claim for relief that is plausible on its face, which is enough to survive a motion to dismiss.

Conversely, even if Defendant "reasonably believed that it was necessary to use deadly force, the Court would still have to determine whether he recklessly or deliberately brought about the need to use such force."[18]  The Court's inquiry goes beyond the "split-second moment when officers make a decision about whether to use deadly force, but will also include "an officer's conduct prior to the suspect's threat of force if the conduct is immediately connected to the suspect's threat of force."[19]  "The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."[20]  This "is simply a specific application of the 'totality of the circumstances' approach inherent in the Fourth Amendment's reasonableness standard."[21]

---

[18]*Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997) (internal citation and quotations omitted).

[19]*Id.* (internal citation and quotations omitted).

[20]*Sevier*, 60 F.3d at 699.

[21]*Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001).

Here, Plaintiff alleges that Defendant Roberson "grossly violated widely accepted law enforcement standards on crisis intervention and the use or force" by failing to use a trained negotiator, failing to use chemical munitions, and needlessly escalating the situation.  Plaintiff further alleges that Defendant Roberson believed it unlikely that Stuckey was going to harm herself or others, which, viewed in the light most favorable to Plaintiff, suggests that there was no need to proceed immediately with the forced entry.  These allegations, taken as true, state a plausible claim that Defendant Roberson recklessly or deliberately brought about the need to use deadly force.  Thus, even if the Court found that Defendant Roberson had the necessary probably cause to believe at the time of the shooting that there was a threat of serious physical harm to himself or others that would justify his use of deadly force, the Court would find that, under these facts as alleged, Defendant Roberson recklessly or deliberately brought about the need to use deadly force.  This is enough to survive a motion to dismiss.

Because the Court has determined that Plaintiff alleged an underlying constitutional violation, the Court now assesses the claims in Counts I, II, III, and IV against each Defendant.

### 1. Defendant Roberson

Although the Court has determined that Plaintiff's factual allegations demonstrate that Defendant Roberson violated a constitutional right, Defendant Roberson claims qualified immunity.  When a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of showing (1) the defendant's violation of a constitutional right; and (2) that the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged

conduct was illegal."[22]  Here, the Court has already determined that Plaintiff alleged the violation

of a constitutional right, but to defeat a claim of qualified immunity, Plaintiff must show that the

right was clearly established.[23]

The Court "cannot find qualified immunity wherever we have a new fact pattern."[24]  The

Tenth Circuit has "shifted the qualified immunity analysis from a scavenger hunt for prior cases

with precisely the same facts toward the more relevant inquiry of whether the law put officials

on fair notice that the described conduct was unconstitutional."[25]  "[A] general constitutional rule

. . . can apply with obvious clarity to the specific conduct in question, even though [such

conduct] has not previously been held unlawful."[26]  In sum, the qualified immunity analysis

requires that we determine whether a reasonable officer would have known that the conduct at

issue was unconstitutional.

Here, then, taking the facts as Plaintiff relates them and making inferences in Plaintiff's

favor, the Court must determine whether a reasonable officer would have known that shooting

Stuckey when she had not yet picked up a knife and when she was not even facing the officers

was unconstitutional.  This is not a close question and thus does not require great specificity

---

[22]*Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007).

[23]*Id.*

[24]*Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

[25]*Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (internal quotation marks and citation omitted).

[26]*Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006) (internal quotation marks and alteration omitted).

from prior case law to clearly establish that the actions were unlawful.[27]  Nevertheless, the Tenth Circuit has clearly stated that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."[28]  Even absent Tenth Circuit precedent directly on point, the Supreme Court's holding in *Graham*, that use of deadly force was justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others, should put a reasonable officer on notice that he could not shoot an unarmed individual.[29]

Moreover, even if the Court had determined that Defendant Roberson reasonably believed that it was necessary to use deadly force, the Court would still find that the remaining conduct alleged by the Plaintiff, that is, Defendant Roberson's reckless or deliberate conduct that precipitated the use of deadly force, was conduct that a reasonable officer would have recognized as unconstitutional.

The Tenth Circuit addressed a similar circumstance in an unpublished case, *Hastings v. Barnes*.[30]  In *Hastings*, the plaintiff's son called a counseling hotline to report that he was contemplating suicide.  The counselor sent police officers to the son's home; when they arrived, they entered the home with weapons drawn and pursued the son to his bedroom.  The son grabbed a sword in his bedroom and held it in a defensive posture; an officer pepper sprayed the

---

[27]*Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

[28]*Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).

[29]*Graham*, 490 U.S. at 396.

[30]252 F. App'x. 197, 203 (10th Cir. 2007).

son, and then the son charged the officers, who shot him.  The Tenth Circuit focused not on the shooting itself, but rather on the officers' actions preceding the shooting, and observed:[31]

> [The son] was not a criminal suspect.  He was a potentially mentally ill/emotionally disturbed individual who was contemplating suicide and had called for help.  Rather than attempt to help [him, the officers] crowded themselves in [his] doorway (leaving no room for retreat), issued loud and forceful commands at him and pepper-sprayed him, causing him to become even more distressed. At the time they pepper-sprayed him, [the son] was not verbally or physically threatening them. . . . Although [the son] had a sword, his stance, at least up until the time he was pepper-sprayed, was defensive not aggressive, posing no threat to anyone but himself.

The court concluded that, under these facts, a jury could conclude that the officers' actions unreasonably escalated the situation to the point deadly force was required.  Further, the court concluded that the Tenth Circuit had clearly established that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner.[32]  Here, under the facts as alleged by the Plaintiff, the officers responded to a call from a woman they knew to be mentally ill.  They unreasonably escalated the situation, neglected to use a negotiator or other individual trained in talking to mentally ill people, and aggressively precipitated the use of deadly force against Stuckey.  The conduct alleged by Plaintiff was clearly established as unconstitutional at the time of the incident.

### 2. Defendants Olson, Stewart, Meyer, Taylor, and Micheel

In Count I, Plaintiff claims that Defendants Olson, Stewart, Meyer, Taylor, and

---

[31]*Id.*

[32]*Id.* at 206 (citing *Allen,* 119 F.3d at 840; *Sevier*, 60 F.3d at 699).  Although *Hastings* is unpublished, the court relied on two published cases to determine that such conduct has been clearly established as unlawful.

Micheel— the officers that entered Stuckey's apartment with Roberson—are individually liable for use of excessive force.  Defendants Olson, Stewart, Meyer, Taylor, and Micheel maintain that the excessive force claims against them should be dismissed because Plaintiff presents no factual allegations that they personally used any excessive force against Stuckey.  Plaintiff, however, argues that because all of these Defendants entered Stuckey's apartment as a team and actively assisted and worked with Defendant Roberson, they are also liable for his use of deadly force in violation of Stuckey's constitutionally protected rights.

Courts have held officers liable in excessive force cases even when they did not personally use deadly force,[33] although in most of these cases, the officers in question at least fired at the plaintiff.  But in a case analogous to this one, *Strachan v. City of Federal Heights*, the court found that even non-firing officers could be liable when the officers entered the plaintiff's apartment as a team, even though only one defendant actually fired his weapon.[34]  In *Strachan*, five officers entered an apartment without a warrant, responding to a call that the plaintiff had fired a weapon out his bedroom window.[35]  When the plaintiff did not respond to the officers' calls or knocks, the officers broke into the apartment.[36]  They opened the plaintiff's bedroom door, and one officer fired his gun, injuring the plaintiff.[37]  The non-firing officers argued that

---

[33]*See Diaz v. Salazar*, 924 F. Supp. 1088, 1097 (D.N.M. 1996) (citing *Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989); *Grandstaff v. Borger*, 767 F.2d 161 (5th Cir. 1989); *Strachan v. City of Federal Heights*, 837 F. Supp. 1086 (D. Colo. 1993)).

[34]837 F. Supp. at 1091.

[35]*Id.* at 1089.

[36]*Id.*

[37]*Id.*

they could not be liable because they did not personally harm the plaintiff.[38]  Disagreeing, the court noted that § 1983 liability extends to those who "subject or *cause to be subjected*, any citizen . . . to a deprivation of rights . . . secured by the Constitution."[39]  Because the plaintiff presented evidence that the entire operation was substandard and likely to result in the use of deadly force, the court found that the non-shooting officers could be liable—those officers participated in an operation that caused the plaintiff to be deprived of his constitutional rights and the officers' actions were not objectively reasonable.[40]

Similarly, Plaintiff here has alleged facts showing that the entire operation of entering Stuckey's apartment was substandard and likely to result in a violation of Stuckey's constitutional rights.  The non-shooting officers here were not just passive observers.  As a team, they used a battering ram to knock down Stuckey's front door, they forced their way into the apartment wearing riot gear, and they initiated a physical altercation with the mentally unstable Stuckey.  The officers forcibly relieved Stuckey of her bat and broom, chased her into the living room, and then Defendant Roberson fired three shots as Stuckey was about to pick up a knife.  Although no officer other than Defendant Roberson used deadly force, Plaintiff's allegations show that this case is analogous to *Strachan*.  All of the officers caused Stuckey to be deprived of her constitutional rights by participation in a substandard operation, and their actions were not objectively reasonable.

Because the officers claim qualified immunity, the Court must now determine whether

---

[38]*Id.* at 1091.

[39]*Id.* (quotation omitted).

[40]*Id.*

16

the right at issue was firmly established, that is, whether a reasonable officer would have known that the conduct at issue was unconstitutional.  As discussed above, it was clearly established at the time of this incident that an officer acts unreasonably when he aggressively confronts an armed and suicidal or emotionally disturbed individual without gaining additional information or approaching him in a nonthreatening manner.  Acting in such a manner is likely to result in the use of deadly force and is objectively unreasonable.  Thus, the Court cannot dismiss the Count I excessive force claim against Defendants Olson, Stewart, Meyer, Taylor, and Micheel.

In Count IV, Plaintiff claims that Defendants Olson, Stewart, Meyer, Taylor, and Micheel are individually liable for failing to intercede and protect Stuckey from Defendant Roberson's alleged excessive force.  All law enforcement officers have an affirmative duty to intervene to protect the constitutional rights of persons when other law enforcement officers deprive those rights in their presence.[41]  If an officer fails to intervene and observes or has reason to know that the other officer is using excessive force, the officer is liable for any preventable harm caused by the other officer's unconstitutional action.[42]  But for liability to attach for failure to intervene, the officer must have had a realistic opportunity to prevent the harm from occurring.[43]

Defendants argue that because the other officers had no way to know that Defendant Roberson would use deadly force against Stuckey, they had no realistic opportunity to intervene.  Plaintiff, on the other hand, argues that Defendants Meyer, Olson, Stewart, Taylor, and Micheel

---

[41]*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996)).

[42]*Id.*

[43]*Id.*

had the opportunity to refuse to break down the door, refuse to storm into Stuckey's apartment, stop Defendant Roberson from drawing his gun after his attempts to TASER Stuckey failed, and prevent Defendant Roberson from pursuing Stuckey as she retreated into her apartment.  Under the facts as Plaintiff has alleged them, the officers had an opportunity to stop Defendant Roberson and failed to do so, rendering them liable for his use of excessive force.  To the extent that Defendants disagree, this is a question of fact for the jury.[44]

Further, it was clearly established at the time of this incident that an officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983.[45]  Thus the Court will not grant the Defendants' motion to dismiss Count IV for failure to state a claim.  However, the Court grants the motion to dismiss the fourth count because failure to intervene is not a separate allegation, but rather a way to establish indirect liability for the use of excessive force.[46]  Thus the Court grants the motion to dismiss Count IV, but will treat the factual allegations in Count IV as allegations supporting Count I.

### 3. Defendants Lovett, Schwartzkopf, and Jordan

Plaintiff claims that Defendants Lovett, Schwartzkopf, and Jordan are individually liable

---

[44]Even if the Court were to consider the recording, our consideration of the recording would not change the Court's decision here.  The recording gives some audio from the events around the shooting, but without more detail, the Court is not able to discern exactly what transpired, and thus cannot say, as a matter of law, that the officers had insufficient time to intervene.  This unresolved issue remains a question of fact for the jury.

[45]*Mick*, 76 F.3d at 1136; *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (holding that a duty to intervene to prevent a fellow officer's use of excessive force was clearly established law in 2003); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984) (ruling that officer who did not prevent fellow officer's use of allegedly excessive force against an arrestee "may be liable [under § 1983] if he had the opportunity to intervene but failed to do so"), vacated on other grounds, 474 U.S. 805 (1985).

[46]*Fogarty*, 523 F.3d at 1163, 1164–65 (holding that indirect liability for excessive force may be based on a failure to intervene and finding that a separate failure-to-intervene count is not necessary under § 1983 ).

for the excessive use of force both in Count I and in Count III based on their supervision of the operation.  Defendants argue that Plaintiff has not alleged facts that create liability for Defendants Lovett, Schwartzkopf, and Jordan.  Defendants further argue that, even if Plaintiff has alleged facts creating such liability, Defendants Lovett, Schwartzkopf, and Jordan are entitled to qualified immunity.

Although Defendants Lovett, Schwartzkopf, and Jordan supervised Defendant Roberson, the Court's finding that Plaintiff alleged facts sufficient to show that Defendant Roberson violated Stuckey's clearly established constitutional rights does not mandate the same finding for his supervisors.  A plaintiff must show a violation of a clearly established constitutional right for each defendant in a § 1983 suit who claims qualified immunity;[47] § 1983 does not give a plaintiff a right of action against an individual government official under a theory of respondeat superior.[48]

Nevertheless, a supervisor can be liable for the injuries caused by the conduct of a subordinate "in situations where an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."[49]  The affirmative link between the constitutional violation and the supervisory defendant is typically shown through the supervisor's "adoption of any plan or policy  . . . showing authorization or approval of such misconduct."[50]

---

[47] *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010).

[48] *Id.* (citing *Iqbal*, 556 U.S. at 676).

[49] *Fogarty*, 523 F.3d at 1162 (internal quotation marks omitted).

[50] *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

Based on Plaintiff's allegations, Defendant Lovett had tactical command of the scene at Stuckey's apartment, decided not to use an officer trained in hostage negotiations, ordered that Stuckey be given a two-minute deadline to surrender, approved Defendant Roberson's substandard plan for entering the apartment, and ordered the forced entry itself. The facts also support an inference that Defendant Lovett was closely supervising the officers on the scene.[51] Based on the Court's determination, under Plaintiff's alleged facts, that Defendant Roberson's plan unreasonably escalated the situation and aggressively precipitated the use of deadly force against Stuckey, the Plaintiff shows an affirmative link between a constitutional deprivation and Defendant Lovett's exercise of control or direction and his failure to supervise. Thus, the Court denies Defendant Lovett's motion to dismiss Counts I and III. As the Court discussed above, the Constitutional rights at issue here were well established at the time of this incident, so the Court also denies Defendant Lovett's request for qualified immunity.

Plaintiff also successfully states a claim in Count III against Defendant Schwartzkopf. Plaintiff alleges that Defendant Schwartzkopf was on the scene and approved Roberson's plan for entry into the apartment. As above, based on the Court's determination that Defendant Roberson's plan unreasonably escalated the situation and aggressively precipitated the use of deadly force against Stuckey, the Plaintiff shows an affirmative link between a constitutional deprivation and Defendant Schwartzkopf's exercise of control or direction and his failure to supervise. Because the Constitutional rights at issue here were well established at the time of this incident, the Court also denies Defendant Schwartzkopf's request for qualified immunity.

---

[51]*Buck v. City of Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008) (allowing excessive force claim against supervisor when "he was the commanding officer and held a tight rein on his officers' actions").

The Court dismisses Count I against Defendant Schwartzkopf, because Count I does not allege any facts concerning Defendant Schwartzkopf.

Plaintiff alleges that Defendant Jordan is the top supervisor and final policy maker for the Prairie Village Police Department, that he recklessly and needlessly escalated the situation by authorizing the officers' entry into Stuckey's apartment, and that he failed to provide necessary leadership, training, and supervision to his officers. The Fourth Amendment reasonableness test extends to a supervisor's authorization of a particular degree of force to effect a seizure.[52] Because Plaintiff does not allege that Defendant Jordan gave his approval for officers to enter the apartment knowing that the officers would use excessive force, the Court only reviews his decision to give his approval and does not address the specific conduct of the officers after he gave the approval. Plaintiff alleges that Defendant Schwartzkopf briefed Defendant Jordan about the ongoing confrontation before getting his approval for the forced entry, but does not allege that Defendant Jordan knew any of the details of the planned entry. According to the allegations, Defendant Roberson planned the entry after Defendant Jordan gave his approval, so Defendant Jordan could not know that the operation plan did not include any provision for use of methods—further negotiations, the use of chemical munitions, or the use of non-lethal weapons—other than the forcible entry of the apartment to remove Stuckey. These aspects of the operation plan are the factors that make it unreasonable; Defendant Jordan's approval of entering the apartment in the abstract, absent allegations that he approved the operational plan or the method of entry, does not suffice to create the necessary affirmative link between the

---

[52]*Holland ex rel. Overdorff v. Harrington* 286 F.3d 1179, 1190 (10th Cir. 2001).

constitutional deprivation and either the supervisor's exercise of control or direction or his failure to supervise.  Thus the Court determines that Plaintiff fails to state a claim against Defendant Jordan in his personal capacity in both Count I and Count III.

### B. Municipal Liability

A municipality may not be held liable under § 1983 simply because it employs a person who is liable under § 1983.[53]  Instead, to hold a municipality liable under § 1983 for acts of its employees, a plaintiff must establish that the municipality has a policy or custom that directly caused the constitutional deprivation of rights.[54]  A plaintiff may show that a municipality has such a policy or custom in at least five ways: (1) a formal regulation or policy statement; (2) an informal custom that is "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;" (3) "the decisions of employees with final policymaking authority;" (4) ratification of the subordinate employees' actions by employees with final policymaking authority; and (5) failure to train or supervise employees resulting from a deliberate indifference to the injuries that may be caused by that failure.[55]

In Count I, Plaintiff asserts a claim against the City for unconstitutional use of excessive force, but fails to make any allegations in Count I that could support municipal liability.  Thus, the Court dismisses Count I as against the City.

---

[53]*Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (10th Cir. 1978).

[54]*City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

[55]*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (internal citations and quotation marks omitted).

In Count II, Plaintiff argues that the City had a policy or custom that directly caused Stuckey's deprivation of constitutional rights under the fifth (failure to train/supervise) and perhaps the fourth (ratification) method of establishing municipal liability.[56]  Plaintiff asserts her claim against both the City of Prarie Village and Defendant Jordan in his official capacity.  As the Supreme Court has held, an official-capacity claim is merely another way of pleading an action against the entity of which the individual defendant is an agent.[57]  Thus, the Court dismisses the official capacity claims against Defendant Jordan in Counts I and II as redundant.[58]

### 1. Ratification of Subordinates' Action

"[A] municipality will not be found liable under a ratification theory unless a final decision maker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."[59]  Plaintiff does not clearly attempt to allege that Defendant Jordan ratified his officers' unconstitutional actions.  To the extent that the Complaint does try to make this allegation, it fails to state a claim.  Plaintiff alleges no facts showing an after-the-fact ratification of any subordinate's action.

### 2. Inadequate Training of the Individually-Sued Police Officers

To state a claim for municipal liability under § 1983 for inadequate training or supervision of police officers in use of force, a plaintiff must allege facts that show:

---

[56]To the extent Plaintiff seeks to establish liability under any of the other methods, she fails to state a claim by inadequately developing the argument and by inadequately alleging facts to support it.

[57]*Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[58]*Bell v. City of Topeka, Kansas*, 496 F. Supp. 2d 1182, (D. Kan. 2007) (holding that official capacity claims against employees of the City of Topeka are duplicitive when the City of Topeka is also a named defendant).

[59]*Bryson v. City of Oklahoma City*, 627 F.3d 784, 790 (10th Cir. 2010).

(1) the officers exceeded their constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.[60]

As discussed in the previous section, taking Plaintiff's allegations as true, she has established that the officers exceeded their constitutional limitations on the use of force. This fulfills the first requirement. The Plaintiff has also alleged facts meeting the second requirement, and, moreover, the parties do not disagree that this situation is a usual and recurring situation with which officers must deal.

For the third requirement,

[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.[61]

Further, "[e]ven where the City's "policy is not unconstitutional, a single incident of excessive

---

[60]*Allen*, 119 F.3d at 841–42 (citing *Zuchel v. City & County of Denver*, 997 F.2d 730, 734–25 (10th Cir. 1993)).

[61]*Carr*, 337 F.3d at 1229 (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (internal quotation marks and citations omitted)).

force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy."[62]  In short, Plaintiff must allege facts sufficient for the Court to conclude that "the City had notice[, actual or constructive,] that its actions (or failures to act) were likely to result in constitutional violations [and that] the City consciously chose to disregard the risk of harm."[63]

Here, the Plaintiff seeks to prove a City custom of failing to train or supervise its officers based on an alleged City practice of using deadly force without regard for the need for the use of such force, an alleged City practice of failing to adequately investigate an officer's use of force, an alleged City practice of failing to investigate whether operational plans comply with reasonable police standards, an alleged City practice of failing to investigate constitutional violations committed by law enforcement officers, and an alleged City practice of failing to follow the police department's written policies on the use of force and CIRT operations. Further, Plaintiff alleges that the City and Defendant Jordan were deliberately and/or recklessly indifferent to the constitutional violations that could result from these alleged failures.  These allegations, if proven, show that the City had actual or constructive notice that its failure to adequately train or supervise its officers was likely to result in constitutional violations and that the City consciously chose to disregard the risk of harm.  Thus, the Court cannot dismiss this count for failing to meet the third requirement.

Finally, under the fourth requirement, "for liability to attach in a failure to train case, the

---

[62]*Id.* (citing *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000)).

[63]*Id.*

identified deficiency in a city's training program must be closely related to the ultimate injury, so that it actually caused the constitutional violation."[64]  Although showing causation in a failure-to-train case is difficult, a plaintiff can succeed by showing how assertedly inadequate training led directly to the use of excessive force.[65]  Here, Plaintiff alleges that the inadequate training and supervision detailed in her allegations directly caused the violations of Stuckey's rights at issue in this litigation.  Further, the harm that befell Stuckey is the kind of harm that the City's and Defendant Jordan's alleged failures would be expected to cause.  Thus the Plaintiff has met the fourth requirement, alleging causation.

Because the Plaintiff has met all four requirements, she has stated a claim for municipal liability under § 1983 for inadequate training or supervision of police officers.

### C. Intentional Deprivation of Stewart's Right to Familial Association

In Count V, Plaintiff claims that Defendants violated her right to familial association with her daughter, Stuckey.  Defendants argue that Plaintiff fails to state a claim because no one violated Plaintiff's right to associate with her daughter.  The Tenth Circuit recognized the right of familial association as a constitutionally protected liberty interest in *Trujillo v. Board of County Commissioners*.[66]  In that case, the Tenth Circuit explained that, to state a claim under § 1983 based on a deprivation of the right to familial association, the plaintiff must not only allege interference but must also allege an "intent to interfere with a particular relationship protected by

---

[64]*Id.* at 1231 (citing *Brown,* 227 F.3d at 1290 (internal quotation marks and citations omitted)).

[65]*Id.*

[66]768 F.2d 1186 (10th Cir. 1985).

the freedom of intimate association."[67]  To meet this requirement, the plaintiff must allege that the defendant directed his "statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship."[68]  And the intent must be directed at the *plaintiff's* rights—the intent cannot be transferred from another person, even another family member.[69]

Thus, the Court must look to see whether the Defendants directed their acts at Stewart's familial relationship with her daughter with knowledge that the acts would adversely affect Stewart's rights.  Plaintiff states that Stuckey told officers that she wanted to speak with Stewart, her mother.  She then gave Defendant Taylor her mother's name and telephone number.  Defendant Taylor later told Stuckey that he could not contact Stewart and that Stewart would not be able to talk to her.  Contrary to Defendant Taylor's statements to Stuckey, no one had called Stewart to inform her of the situation with her daughter.  From these alleged facts, Plaintiff argues that the decision not to contact Stewart despite her daughter's request constitutes deliberate interference with Stewart's right to associate with her daughter.  Through this deliberate interference, Stewart alleges, Defendants deprived Stewart of the chance to reason with her daughter and persuade her to accept help.

The Court finds Plaintiff's claim problematic for two reasons.  First, Plaintiff has not

---

[67]*Id.* at 1190.

[68]*Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993).

[69]*Trujillo*, 768 F.2d 1186, 1189–90 (10th Cir. 1985) (holding that, "[a]lthough the complaint alleges intent with respect to [the deceased inmate's] rights, this intent may not be transferred to establish intent to deprive his mother and sister of their constitutionally protected rights").

identified how Defendants interfered with *Stewart's* right of familial association.[70]  Second, Plaintiff failed to allege facts showing that the Defendants acted with *knowledge* that their failure to call Stewart would adversely affect her relationship with her daughter.

### 1. Interference with Familial Relationship

Defendants argue that Plaintiff has not alleged that Defendant Roberson's use of force was directed at the familial association between Stewart and her daughter, Stuckey.  Plaintiff clarifies that she is not alleging that Defendants interfered with her right of familial association through Defendant Roberson's use of force.  Instead, Plaintiff asserts that "Defendants interfered with her right of association when they intentionally failed to contact her and lied to her daughter."  If this conduct could at all be considered interference with familial association,[71] it would be interference with Stuckey's rights and not Stewart's.  The Defendants' alleged intent to interfere with Stuckey's right to familial association cannot be transferred to establish intent to deprive her mother, Stewart, of her constitutionally protected rights.

Moreover, Plaintiff alleged that the officers did not comply with Stuckey's request, but Plaintiff has not alleged that Defendant prevented her from talking to her daughter.  This is not a case where Stewart attempted to contact her daughter, but officers prevented her from doing so.  Officers here simply failed to take the affirmative act of calling Stewart.  The Court cannot find that this action, or lack of action, constitutes deprivation of Stewart's right of familial

---

[70]*See id.*

[71]Plaintiff has cited no law that would extend the right of familial association to the right to contact a family member.  And even if there was such right, Plaintiff has not alleged that Defendant deprived Stuckey of her only option to contact her mother.  It is therefore unclear whether Defendants even interfered with Stuckey's ability to contact her mother.

association.  To recognize a right to receive a call from a family member as a constitutionally protected right would stretch the right to familial relationship far beyond what it currently protects.  Thus, the Court does not find that Plaintiff has alleged interference with her right of familial association.

### 2. Deliberate Action Directed at Familial Relationship

Even if Plaintiff had alleged an interference with Stewart's right to familial association, the Complaint contains no factual allegations that Defendants' failure to call her was directed at the familial relationship with knowledge that their failure to call would adversely affect that relationship.  Her statement to that effect is a bare legal assertion.  Her factual allegations support her statement by claiming that Stewart would have gone to talk to her daughter if she had been called by the police department, but this allegation does not suggest that the officers knew failing to call Stewart would have negatively affected her relationship with Stuckey.

Thus, because Plaintiff has not identified how Defendants interfered with *her* right of familial association, and because Plaintiff failed to allege facts showing that the Defendants took action knowingly directed at her relationship with her daughter, Plaintiff has failed to state a claim in Count V.

## IV. Ruling

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss (Doc. 3) is **granted in part and denied in part**.  The motion is granted with respect to Count I as against Defendants Schwartzkopf and Jordan in their personal capacities, as against the City, and as against Defendant Jordan in his official capacity; Count II as against Defendant

Jordan in his official capacity; Count III as against Defendant Jordan in his personal capacity; and Counts IV and V in their entirety.[72]  The motion is otherwise denied.

**IT IS SO ORDERED**.

Dated: October 17, 2012

                                                        S/ Julie A. Robinson_____

                                                JULIE A. ROBINSON

                                                UNITED STATES DISTRICT JUDGE

---

[72]This ruling leaves Count I intact as against Defendants Lovett, Roberson, Meyer, Olson, Stewart, Micheel, and Taylor in their personal capacities; Count II as against the City; and Count III as against Defendants Lovett and Schwartzkopf in their personal capacities.